[No. 29072. Department Two. November 27, 1943.]

ELECTRICAL PRODUCTS CONSOLIDATED, *Appellant,* v. MARJORIE ANN SMYSER *et al., Respondents.*[1]

[1]Reported in 143 P. (2d) 452.

*Elliott & Kells,* for appellant.

*Tyre H. Hollander,* for respondents.

ROBINSON, J.—The plaintiff-appellant, Electrical Products Consolidated, a corporation, brought this action to recover with respect to a Neon sign furnished in 1940 to a restaurant then owned by Howard E. Chambers and operated by him under the name of "Nifty Hamburger."

On May 17, 1941, Chambers executed a bill of sale, conveying all the property, equipment, supplies, good will, etc., of the Nifty Hamburger to Marjorie Ann Smyser, a daughter of Ray Smyser. At the trial of this action, she testified, stoutly and repeatedly, that she was the real purchaser and owner, although, in giving a deposition before trial, she had testified that her uncle, Bert Smyser, was the purchaser and owner. Her father, Ray Smyser, testified, not only that he was the real purchaser and owner, but also that he was the owner of a mortgage which Bert Smyser held on the property at the time of the purchase. In explaining his testimony in that regard, he said:

"I used my brother's name like he was the mortgagee in that proposition,—in the paper. The mortgage was drawn in his name because I had these large lawsuits against me at that time."

In view of other cases which we have recently reviewed, in which Bert and Ray Smyser were involved (*Smyser v. Smyser,* 17 Wn. (2d) 731, 137 P. (2d) 107, and *Smyser v. Smyser, ante* p. 42, 140 P. (2d) 959), we think this explanation plausible. We are further inclined to believe, as contended in respondents' brief, that the restaurant was conveyed to Marjorie Ann Smyser "for convenience only,"

and that her father, Ray Smyser, was the actual purchaser and the real defendant in this action. However, in view of the disposition which we have concluded to make of the case, it is unnecessary to determine that matter.

Prior to the conveyance of the business by Chambers and wife to Marjorie Ann Smyser, Chambers, doing business as Nifty Hamburger, had entered into an agreement with Electrical Products Consolidated, in which Electrical Products, as we shall hereinafter call the plaintiff, designating itself as owner, agreed, in part, as follows:

"(a)  The Owner agrees to construct and install, at its own cost, One Epco Zeon Display, hereinafter called the 'DISPLAY,' in conformity with the specifications and conditions set forth in the annexed Exhibit 'A,' and with the plans, if any, hereby approved by the parties hereto. The Owner agrees to furnish said display to the User subject to the conditions and provisions hereinafter provided. This agreement shall be for the term of 36 months, commencing on the first day of the month immediately following the installation of the display and ending at midnight of the day 36 months thereafter."

And Nifty Hamburger agreed, in part, as follows:

"(b)  The User covenants and agrees to pay to the Owner for the cost of constructing and installing said display, for the agreement to supply parts, repairs and maintenance, and for the right and license to use said display upon said premises during the term of this agreement, the sum of $17.00 per month for each and every calendar month during the term of this agreement; said sum to be paid in advance at the office of the Owner, as hereinafter provided."

There are many subsidiary stipulations, and, among them, the following:

"(h)  REMOVAL OF DISPLAY:  The display shall at all times be deemed personal property, and shall not by reason of attachment or connection to any realty become or be deemed a fixture or appurtenant to such realty and shall at all times be severable therefrom and shall be and remain at all times the property of Owner, free of any claim or right of the User, except as set forth herein. Upon the termination of this lease, or any extension hereof, the Owner shall

have and retain the right to remove the display from the premises upon which it is installed."

In several other places in this agreement, which was entered into on June 8, 1940, the instrument is spoken of as "this lease."

The Nifty Hamburger made the first seventeen-dollar payment stipulated in the agreement, but no others, and was in default nearly a year when the business was sold to one or the other of the defendants named in the action. Although the action was broader in scope, the real question raised on appeal is whether or not Electrical Products was entitled to recover the delinquent payments from the purchaser of the business.

The appellant contends that it was entitled to a recovery, first, because the purchaser agreed to assume and pay that indebtedness, and second, because, in making the transfer and sale, the parties did not comply with the bulk sales law. Since we have just quoted from the agreement out of which the indebtedness arose, it seems best to discuss the second contention first.

The bulk sales law was amended at the last session of the legislature. Laws of 1943, chapter 98, p. 236. However, at the time the transaction involved in this case occurred, chapter 122, Laws of 1939, p. 339, codified as Rem. Rev. Stat. (Sup.), §§ 5832-5835 [P. C. §§ 7747-1—7747-4], was in force. We are here concerned with that portion of § 5832 which then read as follows:

"It shall be the duty of every person who shall bargain for or purchase all or substantially all of any stock of goods, wares or merchandise, or any restaurant, cafe, beer parlor, tavern, hotel, club or gasoline service station, and/or all or substantially all of the fixtures and equipment used in and about the business carried on by the vendor, in bulk, for cash or on credit, before paying the vendor, or his agent, or representative, or delivering to the vendor, or his agent, any of the purchase price thereof, or any promissory note or other evidence of indebtedness therefor, to demand of and receive from such vendor, or his agent, . . . a statement in writing, sworn to substantially as hereinafter provided, *giving the names and addresses of all the creditors of*

*the vendor, to whom the vendor may be indebted, for or on account of any goods, wares or merchandise, and/or fixtures and equipment, used in and about the business of the vendor, purchased upon credit,* . . ." (Italics ours.)

In the next section, it is provided, in substance, that, if the vendee fails to demand and receive the statement required by § 5832 and file it in the auditor's office at least five days before paying the purchase price, the sale shall be fraudulent and void as to creditors of the character specified in § 5832. The exact question for decision on this branch of the case is, therefore: Was Electrical Products a creditor of that character?

It is clear, as will be seen by referring to those words which we have italicized in quoting § 5832, that to hold that Electrical Products is a creditor of that character, we must hold that Nifty Hamburger became indebted to it by having purchased, on credit, "goods, wares or merchandise, and/or fixtures and equipment." In the statutory language to be construed, "purchaser" is the master word.

It will be impossible in this opinion to deal adequately with the many contentions made by the appellant on this branch of the case. Citations are made to show that, in law, a lease is frequently regarded as a purchase, such as in the case of *Waskey v. Chambers*, 224 U. S. 564, 56 L. Ed. 885, 32 S. Ct. 597, Ann. Cas. 1913D, 998, and expressions to that effect are quoted from our own decisions, particularly from *Washington Fruit & Produce Co. v. Yakima*, 3 Wn. (2d) 152, 100 P. (2d) 8, 103 P. (2d) 1106, 128 A.L.R. 159. And it is further pointed out that, in that opinion, we reaffirmed the statement made in the former case of *York v. Stone*, 178 Wash. 280, 34 P. (2d) 911, that the word "property" embraces everything of exchangeable value, and held, under that rule, that so intangible a thing as electricity is property and can be purchased and sold.

Definitions of the word "purchase" are quoted from dictionaries, such as the following:

"PURCHASE: 1. To pursue and obtain; to gain or acquire.

"2. (Law) Technically, to acquire (real estate) by any means whatever other than by descent or inheritance.

"3. To obtain (anything) by paying money, or its equivalent, to buy for a price; as to purchase land or a house."

It is also strongly contended that we must construe the law liberally, as directed by Rem. Rev. Stat., § 144, and it is further strongly urged that a construction excluding the class of creditors to which appellant belongs would render the statute unconstitutional and void as unlawfully discriminatory.

Finally, it is said that this court has hitherto given a broader interpretation of the statute in its previous decision in *McRae v. Levy*, 177 Wash. 332, 31 P. (2d) 1028, than that for which the appellant contends. We will take up these contentions in inverse order.

In the case of *McRae v. Levy, supra,* consigned goods were involved. At the very instant the consignee divested the consignor's title by selling the goods, he became indebted to the consignor for the sale price, and, therefore, to all practical intents and purposes, a purchaser as to the consignor. In fact, upon an examination of the record in the case, it appears that, prior to the sale of the business, the proprietor had acknowledged his indebtedness to the consignor with respect to the goods he had used in carrying on the business. These acknowledgments as to the three several claims are exhibits in the cause and justify the explicit finding of the trial court, and the holding of this court, that a debtor and creditor relationship had arisen with respect to goods supplied for use in the business.

The question as to whether or not the law would be unlawfully discriminatory, if held not to include the class of creditors to which appellant belongs, must be answered by inquiring whether there is a reasonable basis for classification. We think it is sufficient to point out that the ordinary creditor, in selling his property to a purchaser, forever parts with all title and interest in it, while the appellant retained complete title to the display sign, and leased or licensed its use only, retaining the right to retake the sign itself at the

termination of the contract, or even before, in the event of certain contingencies. That there is a sufficient difference here to warrant legislative classification is, we think, so apparent as not to require supporting argument.

It is contended that § 144 of the code requires us to give the statute a liberal construction, and it is strongly urged that, since the purpose of the statute was to protect creditors, we must, therefore, construe § 5832 in such a way as to include as many classes of creditors as can reasonably be brought within its language. But, in view of the fact that the very words which we are asked to construe were inserted in the bulk sales law for the express purpose of limiting the class of creditors to be protected by it, this suggestion loses much, if not all, of its force. The original bulk sales law (Laws of 1901, chapter 109, p. 222) protected "all the creditors" to whom the vendor might be indebted. The first amendatory act (Laws of 1913, chapter 175, p. 608) continued that all-inclusive protection. In reenacting the bulk sales law in 1925 (Laws of 1925, Ex. Ses., chapter 135, p. 338), the legislature limited the class of creditors to be protected by adding to the words "all the creditors of the vendor to whom the vendor may be indebted," the following:

". . . for or on account of any goods, wares or merchandise, and/or fixtures and equipment, used in and about the business of the vendor, purchased upon credit."

This is the very language which we are now engaged in construing, for it was retained in the amendatory act of 1939 which was in force when the transaction with which we are concerned took place. Clearly, this language was inserted in the bulk sales law to cut down "all the creditors of the vendor" to those only who had become so by having sold goods, wares, and merchandise and/or fixtures and equipment upon credit. Furthermore, the respondents contend that the rule of construction prescribed by § 144 of the code is not applicable, and cite the following:

"The general rule is that the provisions of Bulk Sales Acts are to be accorded a strict construction, for the reason that they are in derogation of the common-law rules which

secure to the individual a right to alienate his property without restriction." 24 Am. Jur., Fraudulent Conveyances, 352, § 240.

However that may be, the rule of construction which really controls here is the general rule which requires us to give to the words of the statute their ordinary and accepted meaning, as commonly used and understood. It seems plain to us that, in the transaction between Nifty Hamburger and Electrical Products, nothing was purchased, within the ordinarily accepted meaning of that word. No title passed to any goods, wares, or merchandise. It is expressly stated in the agreement that no fixtures were involved. The restaurant got no equipment, but only the use of equipment belonging to Electrical Products. It is the common understanding that, when a thing is purchased, the purchaser becomes the owner thereof. When the use of a thing only is granted, the transaction is one of lease or license, not purchase and sale. In this agreement, prepared by Electrical Products, it calls itself "Owner" and provides that it shall so remain. It calls Nifty Hamburger the "User," and calls the instrument itself "this lease." All of these designations are accurate. Under the circumstances, Electrical Products could not have properly called itself a vendor, or the restaurant a purchaser, or the instrument a bill of sale, since it was not conveying or selling anything, but only granting "a right and license to use." We agree with the trial court that the Electrical Products was not a creditor of the character protected by the bulk sales statute, and that, as to it, the sale of the Nifty Hamburger was not fraudulent and void because of noncompliance with its provisions.

As to the second question presented, which is wholly factual, we must confine ourselves to a statement of our conclusions, since to state and weigh the evidence would treble the length of this opinion.

There is no evidence that the purchaser of the Nifty Hamburger expressly assumed and agreed to pay its debt to the appellant. The appellant contends that the purchaser

did so by assuming and agreeing to pay all of the debts of the business. The bill of sale, after reciting a down payment of $3,500, recites as follows:

"It is agreed that the sale price is $17,000.00 and the purchaser will deduct from the foregoing amount the state sales tax which we estimate to be $285.14 and also to pay therefrom our indebtedness to the American Discount Corporation. This sale is subject to outstanding debts, loans and contracts which do not exceed $13,500.00. An inventory of the property which shall be complete will be prepared immediately and attached hereto and made a part hereof by this reference."

Since $13,500, plus the down payment of $3,500, equals $17,000, it is a reasonable conclusion that the purchaser did agree to pay $13,500 of debts, and the respondents so admit, but have contended that the debts to be paid were listed, and they produced a list as an exhibit, totaling $17,211.27, upon which the debt of Nifty Hamburger does not appear. This list, the appellant contends, was manufactured by the respondents after the purchase, and for the purpose of creating a defense to creditors' claims, and very plausible reasons are given in support of this contention. But, to our minds, they do not amount to proof. Nor do we think the affirmative evidence in the record, to the effect that the purchaser assumed and agreed to pay *all* the debts of the business, is strong enough to support a finding to that effect.

It is urged that we should give weight to the fact that at least two of the defendants, and one of the witnesses in their behalf, were thoroughly impeached as to certain phases of the transaction, and that, in weighing their testimony, we should apply the maxim, "False in one thing, false in everything." But discounting their testimony would be of no advantage to plaintiff-appellant. The defendants were not required to prove that they did not agree to pay all the debts of the Nifty Hamburger, but, in order to qualify itself as a third-party beneficiary, the plaintiff was required to prove that they did. The evidence which it adduced on that point is somewhat persuasive, but, wholly disregarding the testimony of the defendants, we think it is not suffici-

ently convincing to warrant us in substituting a finding to that effect for the finding of not proven made by the trial court.

The judgment appealed from is affirmed.

SIMPSON, C. J., MILLARD, BLAKE, and MALLERY, JJ., concur.

